IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORINNE D. WILCOTT,       )<br>           Petitioner,       ) | Civil Action No. 07-299 Erie |
|           )       | |
| v.       ) | Magistrate Judge Baxter |
|           )       | |
| SUPERINTENDENT WILSON, et al.,       )<br>           Respondents.       ) | |

### OPINION AND ORDER[1]

**I.   Introduction**

On March 26, 2003, an Erie County jury found Petitioner Corinne Wilcott guilty of several crimes, including Third Degree Murder Of an Unborn Child, in violation of 18 PA.CONS.STAT.ANN. §§ 2603-04, and Aggravated Assault of an Unborn Child, in violation of 18 PA.CONS.STAT.ANN. § 2606.  The charges against her stemmed from a fight she had with Sheena Carson, her husband's pregnant mistress, during which she kicked Carson in the abdomen.

Pending before this Court is Petitioner's Amended Petition For a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254.  [Document No. 25].  She claims that her Sixth Amendment right to effective counsel was violated because her trial attorney did not present the testimony of an Obstetrician/Gynecologist ("OB/GYN") in order to support the defense theory that Carson's fetus died from an unrelated infection, and also to support the theory that fetal demise occurred before the fight.  Had her trial attorney retained a qualified OB/GYN, Petitioner argues, there is a reasonable probability that the jury would have acquitted her on the homicide and aggravated assault of an unborn child charges.

---

[1]   In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment. (Document No. 5; Document No. 11).  Mary Friedline, Esq., who entered her appearance on behalf of the Warden and the Attorney General's Office, notified the Court that the District Attorney of Erie County would submit the Answer on behalf of the Respondents.  (Document No. 7).

**II.     Relevant Background**[1]

On May 8, 2002, Carson had a sonogram after which the gestational age of her was estimated to be 14-15 weeks. (Day Four Trial Tr. at 84, 173). OB/GYN Andrea Tolson Jeffress, M.D., testified at Petitioner's trial that the age estimation made from a second trimester sonogram is just that – an estimation – and may be off seven to ten days. (Id. at 46-47).

Carson testified that she had not experienced any problems with her pregnancy and had no cramping or abdominal pain until Petitioner kicked her in the abdomen during their fight, which occurred around 1:30 a.m. on June 8, 2002. (Day Three Trial Tr. at 61-62). Carson said that when Petitioner kicked her, she said "I hope the bastard die[s]." (Id. at 57). A short time afterwards, Carson started to experience mild pain and cramping and went to the emergency room. (Id. at 61-62). The emergency room physician was unable to find a fetal heartbeat using a fetal doppler machine and advised Carson to see her OB/GYN. (Id. at 175-76). Carson went to her OB/GYN several days later, on Wednesday, June 12, 2002. A sonogram taken on that date revealed that her fetus was dead. (Day Four Trial Tr. at 64). From the fetal measurements provided by that sonogram, the estimated age of the fetus was 17.1 weeks. (Id. at 45, 172-76).

Dr. Jeffress delivered Carson's stillborn fetus on June 13, 2002. Petitioner was charged with one count of Criminal Homicide Of an Unborn Child, one count of Aggravated Assault Of an Unborn Child, one count of Aggravated Assault against Carson, one count of Simple Assault against Carson, and one count of making Terroristic Threats against Carson.

Petitioner retained Timothy J. Lucas, Esq. Her trial commenced on March 21, 2003. The Commonwealth's theory of the case was that Petitioner's kicks to Carson's abdomen caused a placental abruption that caused the death of the fetus.[2] To support the theory, the Commonwealth called Dr. Jeffress and Eric Vey, M.D., the forensic pathologist who performed

---

[1] Respondents have submitted the original State Court Record ("SCR") and all relevant transcripts. The SCR contains 66 documents and shall be cited to as "SCR No. __ ."

[2] An abruption is a separation of the placenta from the uterine wall. When this separation occurs, the mother bleeds and the blood either leaks out of the vagina (an open abruption) or the blood stays in the uterus (a closed abruption). (Day Four Trial Tr. at 42). Abruptions can cause fetal demise because the separation of the placenta from the uterus disrupts the exchange of oxygen from the mother's blood to the fetus. (Id. at 142).

2

the autopsy of the fetus. Dr. Jeffress testified that when she delivered Carson's fetus stillborn on June 13, 2002, she noticed a number of small blood clots on the placenta. She swabbed both sides of the placenta so that the swabs could be cultured to check for infection. The cultures grown from the swabs grew prevotella disiens, an anaerobic bacteria, and two aerobic bacteria, lactobacillus and yeast. There was no growth of streptococcus B, which is one of the causes of chorioamnionitis, a condition that causes premature delivery. (Day Four Trial Tr. at 31-45).

In her delivery notes, Dr. Jeffress listed the cause of fetal death as "possible abruption." Dr. Jeffress testified that she listed it as such because Carson had suffered a trauma (the kicks to the abdomen), she observed blood clots on the placenta, and she did not observe indications of another cause, such as signs of infection (Carson had no fever, no high white blood cell count prior to the delivery, and there was no foul discharge or odor). (Id. at 41-43).

On June 25, 2002 – twelve days after delivery of the fetus – Dr. Vey performed the autopsy.[3] He testified at trial that the fetus died from "traumatic placental abruption" as a result of "blunt force trauma." (Id. at 124, 140). Dr. Vey explained how he reached this conclusion. He stated that his examination of the placenta revealed a contusion or bruise caused from trauma force. (Id. at 119-124). He also noted that a microscopic examination of the placenta revealed an inflammatory reaction associated with the presence of a blood clot, indicating that there had been an abruption. (Id. at 133-36).

Dr. Vey acknowledged that the microscopic examination of the placenta also revealed a proliferation of bacterial colonies. (Id. at 136-137). The proliferation of bacterial colonies, in his opinion, were the result of postmortem bacteria growth. According to Dr. Vey, because of the twelve-day delay between the delivery and the autopsy, during which time the fetus and placenta

---

[3] Dr. Vey could not recall why twelve days expired between the date of the delivery of the fetus and the date of the autopsy. He said that normally an autopsy should be performed within 24-48 hours after delivery. (Day Four Trial Tr. at 155-58). In his autopsy report, Dr. Vey estimated the fetal age to be 15.2 weeks. Although that estimation on its face appears to conflict with the age estimate made after the June 12, 2002, sonogram (which placed the estimated age of the fetus at 17.1 weeks), Dr. Vey explained he made the 15.2 weeks age estimation from measurements taken of the fetus during the autopsy, and by that date the fetus had begun to decompose and had shrunk 24% (from 106 grams on June 13, 2002, to 80 grams on the date of the autopsy). (Id. at 174-76). Therefore, he explained, "my gestational age, based on the raw data at the time of autopsy, clearly under dates the age of this infant." (Id. at 174).

were stored in an unsterile morgue cooler, "[t]he presence of the bacteria is not a surprise, and is entirely expected." (Id.) Dr. Vey stressed that "[w]hat is important to remember, there is no associated inflammatory response in association with the bacteria present in this case." (Id. at 137-138). This fact was important because "the absence of inflammation in the presence of the bacteria, indicates that the bacteria occurred postmortem" because dead tissue cannot become inflamed. (Id.)

Lucas cross-examined Dr. Jeffress and Dr. Vey in an attempt to show that the Commonwealth could not meet its burdens of proof. He also presented the testimony of Miles J. Jones, M.D., a board certified forensic pathologist who had served for two years in the department of gynecology and obstetrics in the Armed Forces Institute of Pathology ("AFIP"). (Day Five Trial Tr. at 40-42). Dr. Jones testified that in his opinion Carson did not suffer an abruption. He noted a lack of any finding of hemosiderin, a breakdown product of hemoglobin, on the placenta:

> Dr. Jones:   The lack of hemosiderin means there was no body reaction to cleaning up blood. It means there was no significant bleeding at the time from when an abruption supposedly occurred, to when delivery occurred, and the body was still active. The metabolary processes were still present. No hemosiderin means no hematoma, no blood loss.
>
> Lucas:   If there's no hematoma and no blood loss, what does that mean relative to placental abruption?
>
> Dr. Jones:   There was no abruption.

(Id. at 54).

Dr. Jones also testified that, if Petitioner kicked Carson, she did not cause sufficient trauma to cause an abruption. He emphasized that Carson did not complain of severe pain, which is usually a symptom of a placental abruption, nor did she have any bruising on her abdomen, which he said she should have had if, as the Commonwealth contended, she had sustained trauma sufficient enough to cause bruising on the placenta. (Id. at 75, 131-132, 182). Also, Dr. Jones disagreed with Dr. Vey's opinion that there was evidence of a bruise or a contusion on the placenta. (Id. at 72).

Dr. Jones also opined that "the fetus died from an intrauterine infection, and that that

infection as documented in the medical records, was from pretotella disiens."  (Id. at 69).  He explained that his review of the autopsy records revealed microscopic evidence of bacteria in the placenta.  (Id. at 56).  He said that prevotella disiens is an anaerobic bacteria that should not be present in the placenta, and also that the placenta is located next to the endometrium or decidua, where he observed inflammation.  (Id. at 63-65).  Dr. Jones explained that if you have tissue that should not have bacteria in it and if there is inflammation in the endometrium or decidua, that is evidence that the bacteria was present in the tissue before the tissue was removed from the body.  (Id. at 58, 65).  He also pointed out that Carson's white blood cell count was elevated after delivery and that that was evidence of an infection.  (Id at 61).

Although Dr. Jones opined that the fetus could have been dead prior to the fight between Petitioner and Carson[4] (id. at 80-81), Lucas conceded in his closing argument that the evidence indicated that Carson may have been pregnant at that time (id. at 162).  With respect to the charges at issue in the Amended Petition, Lucas argued in his closing that, even if the fetus was alive at the time of the fight, the Commonwealth failed to meet its burden of proving beyond a reasonable doubt that Petitioner's conduct was a direct and substantial factor in bringing about its subsequent death.  Lucas contended that Petitioner did not kick Carson, and that even if she did, the kicks were not delivered with sufficient force to cause an abruption.  He emphasized that Carson only complained of mild abdominal pain when she was at the emergency room just hours after the fight on the morning of June 8, 2002, and suggested that if she had thought her fetus was in jeopardy from the fight she would not have waited until her regularly-scheduled OB/GYN appointment on June 12, 2002, to get follow-up information on her pregnancy.  Lucas also set forth why the jury should believe Dr. Jones over the Commonwealth's experts.  He reminded the jury of the fact that the autopsy was not performed until twelve days after the delivery.  Recalling the changes and contamination of the fetus and placenta that occurred during the time lapse,

---

[4] Dr. Jones said: "[b]ased on my training and experience, and examining photographs of the fetus, looking at the condition of the skin, looking at the microscopic sections of the placenta, and knowing when the window of death occurred, it is my opinion that the fetal death could have occurred as early as two weeks prior to [June 8, 2002]." (Day Five Trial Tr. at 80-81).  As set forth *infra*, in arriving at this opinion, Dr. Jones relied on, *inter alia*, information he received from a consultation with OB/GYN Roger W. Harms, M.D.

Lucas urged the jury not to credit Dr. Vey, the Commonwealth's expert who made the ultimate determination as to the cause of death.  (Id. at 160-85).

On March 26, 2003, the jury found Petitioner guilty of third-degree murder and of the other crimes as charged.  The trial court sentenced her to a term of imprisonment of 84 to 168 months of incarceration on the third-degree murder conviction.  The aggravated assault of an unborn child conviction merged with the third-degree murder conviction for sentencing purposes.

On April 13, 2005, the Superior Court of Pennsylvania issued a decision denying Petitioner's direct appeal.  (SCR No. 51, Commonwealth v. Wilcott, No. 1602 WDA 2003, slip op. (Pa.Super. Apr. 13, 2005)).  On or around April 13, 2006, Petitioner, through her new attorney, Alison M. Scarpitti, Esq., filed a petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT.ANN. § 9541 *et seq.*  (SCR Nos. 52).  Petitioner alleged that Lucas provided her with constitutionally deficient representation based on a number of claims.  Of importance to the instant action was her claim that Lucas was ineffective for failing to obtain and call an OB/GYN, and specifically that he should have called Roger W. Harms, M.D., the OB/GYN with whom Dr. Jones had consulted prior to trial.  (SCR No. 52 at ¶¶ 12a, 12o).  She attached to her PCRA petition a letter from Dr. Harms to Dr. Jones, dated May 17, 2003.  In the letter, Dr. Harms wrote that after reviewing the data from the June 12, 2002, sonogram, his "best estimate" was that fetal demise occurred at 17 to 18 weeks.  (5/17/03 Letter, attached to SCR No. 52).

An evidentiary hearing was held on July 25, 2006, at which Lucas testified.  (See PCRA Hr'g Tr.).  Petitioner did not present the testimony of Dr. Harms or any other OB/GYN.  On August 25, 2006, the PCRA Court issued an Opinion and Order denying post-conviction relief.  (SCR No. 60, Commonwealth v. Wilcott, Criminal Div. No. 2426 of 2002, slip op. (C.P. Erie, Aug. 25, 2006)).  It denied Petitioner's ineffective assistance claims at issue in the instant action on the merits.  Petitioner appealed.  On August 28, 2007, the Superior Court issued a decision affirming the denial of PCRA relief.  (SCR No. 66, Commonwealth v. Wilcott, No. 1865 WDA 2006, slip op. (Pa.Super. Aug. 28, 2007)).  It adopted in full the PCRA Court's decision as its own.

6

Next, Petitioner filed in this Court a *pro se* petition for writ of habeas corpus in which she raised numerous claims, including eleven claims of Lucas' alleged ineffectiveness. Thereafter, Thomas W. Patton, Esq., entered his appearance on Petitioner's behalf. On April 1, 2009, Petitioner filed the instant Amended Petition For a Writ Of Habeas Corpus Pursuant to 28 U.S.C. § 2254, in which she raises only one claim – that Lucas was ineffective failing to retain a qualified OB/GYN to testify as an expert for the defense. [Document No. 25]. John H. Daneri, Esq., of the Erie County District Attorney's Office, filed the Respondents' Answer to the Amended Petition. [Document No. 27]. On February 1, 2010, Petitioner filed a motion for an evidentiary hearing. [Document No. 28].

### B. Discussion

#### 1. This Court May Not Conduct An Evidentiary Hearing

Before this Court turns to the merits of Petitioner's ineffective assistance claim, her request for an evidentiary hearing must be addressed. She has attached to her Amended Petition the following documents: (1) two letters from Lucas to Petitioner's mother, dated February 10, 2003, and February 13, 2003, respectively; and (2) a letter dated February 26, 2009, to Petitioner's current counsel from OB/GYN J. Christopher Glantz, M.D., M.P.H., and Dr. Glantz's curriculum vitae. [Exs. B-E of the Amended Petition, Document No. 25]. A petitioner may not simply attach documents to her habeas petition and ask the district court to consider them. Rather, evidence relied upon by the petitioner that is not otherwise part of the state court record must be properly admitted into the record before the district court. Petitioner seeks an evidentiary hearing in this Court in order to do so.

Petitioner's request for an evidentiary hearing is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which made significant changes to the federal statute governing state habeas petitions filed pursuant to 28 U.S.C. § 2254. AEDPA was designed "to further the principles of comity, finality, and federalism." Michael Williams v. Taylor, 529 U.S. 420, 436 (2000). It "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693

(2002) (per curiam).

Importantly, AEDPA, as codified at 28 U.S.C. § 2254(e)(2), limits the ability of a federal district court to hold an evidentiary hearing.  See Michael Williams, 529 U.S. at 429-45; Palmer v. Hendricks, — F.3d — , 2010 WL 282086, *5-6 (3d Cir. Jan. 26, 2010); Lewis v. Horn, 581 F.3d 92, 104-05 (3d Cir. 2009); Goldblum v. Klem, 510 F.3d 204, 220-21 (3d Cir. 2007); Taylor v. Horn, 504 F.3d 416, 435-37 (3d Cir. 2007); Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006); Thomas v. Varner, 428 F.3d 491, 497-99 (3d Cir. 2005).  Under AEDPA, if a state prisoner had the opportunity to develop the factual basis of her claims in the state court by way of, *inter alia*, a PCRA hearing, a federal court sitting in habeas may not provide her with a second opportunity to submit additional evidence by way of a hearing before it.  Goldblum, 510 F.3d at 220 (citing 28 U.S.C. § 2254(e)(2)); see Rolan, 445 F.3d at 680-81 (district court erred in conducting an evidentiary hearing on a claim when the state court had conducted a hearing on the same issue); Taylor, 504 F.3d at 435-37.  That is because when the failure to develop the record before the state court *is attributable to the petitioner*, AEDPA prohibits an evidentiary hearing in federal court.  28 U.S.C. § 2254(e)(2).[5]  See, e.g., Lewis, 581 F.3d at 105 (quoting Michael Williams, 529 U.S. at 435 (the purpose of § 2254(e)(2) is "to ensure the prisoner undertakes his own diligent search for evidence")); Taylor, 504 F.3d at 437 (quoting Michael Williams, 529 U.S. at 437 ("Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.")); id. at 436-37, 439 n.19 (the petitioner was not entitled to introduce new evidence in his federal habeas proceeding when he had the opportunity to present that evidence when he was litigating the claim at issue in state court).

In this case, Petitioner had a PCRA hearing during which she had the opportunity to develop evidentiary support for her ineffective assistance of counsel claim.  Any failure to

---

[5]  When the failure to develop the factual basis of a claim in the state court *is not attributable to the petitioner*, it is within the district court's discretion to grant an evidentiary hearing on a claim.  Schriro v. Landrigan, 550 U.S. 465, 473-75 (2007); Palmer, — F.3d — , 2010 WL 282086, *5-8; Rolan, 445 F.3d at 680-81; Thomas, 428 F.3d at 497-98.

develop additional evidence (including the opinion expressed by Dr. Glantz in his February 26, 2009, letter) is attributed to her.

Accordingly, this Court is statutorily barred from conducting an evidentiary hearing and habeas review is limited to examining the record developed before the state court under the standards set forth in 28 U.S.C. § 2254(d) and (e)(1) (discussed *infra*). Taylor, 504 F.3d at 435-37; Rolan, 445 F.3d at 678-81; Goldblum, 510 F.3d at 221. See also Holland v. Jackson, 542 U.S. 649, 652 (2004) (per curiam) (citations omitted) ("[W]e have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the [state] court had before it."). Therefore, while Petitioner relies heavily on the documents attached to the Amended Petition, particularly the opinions expressed in Dr. Glantz's February 26, 2009, letter, this Court may not consider them. They are not part of the state court record and she may not introduce them into the record by way of a federal evidentiary hearing.

### 2. Standard of Review

In addition to placing limits on a federal habeas court's ability to hold an evidentiary hearing, AEDPA also "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations." Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004). As codified at 28 U.S.C. § 2254(d)(1), AEDPA restricts a federal court's authority to grant relief when, as is the case here, the state court has adjudicated on the merits the petitioner's federal constitutional claims. Under § 2254(d)(1), this Court may grant habeas relief only if the PCRA Court's adjudication of Petitioner's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" See also Terry Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert, 387 F.3d at 234.[6]

"A state-court decision is 'contrary to' clearly established federal law if the state court

---

[6] In reviewing the claim raised in the Amended Petition, this Court must look to the PCRA Court decision, as it was adopted in full by the Superior Court. See Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008) (Applying AEDPA deference to PCRA court decision "since it either represents the state courts' last reasoned opinion on this topic or has not been supplemented in a meaningful way by the higher state court.").

(1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert, 387 F.3d at 234 (quoting Terry Williams, 529 U.S. at 405-06). "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular…case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Terry Williams, 529 U.S. at 407).

State court factual determinations are also given considerable deference under AEDPA. Lambert, 387 F.3d at 239. Under § 2254(d)(2), a petitioner must establish that the state court's adjudication of her claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Within this overarching standard, she may attack specific factual determinations that are subsidiary to the ultimate decision. See 28 U.S.C. § 2254(e)(1); Lambert, 387 F.3d at 235. Section 2254(e)(1) instructs that "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

### 3. Discussion

The "clearly established Federal law" for AEDPA purposes in which to analyze Petitioner's claim of ineffective assistance is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Petitioner first must show that Lucas' representation fell below an objective standard of reasonableness." 466 U.S. at 688; see also Terry Williams, 529 U.S. at 390-91. The law presumes that Lucas was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

> conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted). There is no one correct trial strategy. Id.; Lewis v. Mazurkiewicz, 915 F.2d 106, 115 (3d Cir.1990) ("[W]hether or not some other strategy would have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained."). The Court of Appeals for the Third Circuit has explained that it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)).

Strickland also requires Petitioner to show that she was prejudiced by Lucas' alleged deficient performance. "This requires showing that counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. In other words, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The PCRA Court applied the correct legal standard when it evaluated Petitioner's ineffective assistance claim. (SCR No. 60, Wilcott, Criminal Div. No. 2426 of 2002, slip op. at 7-8 (citing Commonwealth v. Lowery, 784 A.2d 795, 798-99 (Pa.Super. 2001)). See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (legal standard for evaluating ineffective assistance claims in a PCRA proceeding is the same as the federal Strickland standard). Therefore, its adjudication of Petitioner's claim satisfies review under the "contrary to" clause of § 2254(d)(1). See Terry Williams, 529 U.S. at 406; Werts v. Vaughn, 228 F.3d 178, 202-04 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").

Thus, the only remaining questions for this Court to decide is whether the PCRA Court's

11

adjudication was an "unreasonable application of" Strickland or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). It was neither.

At the PCRA hearing, Lucas testified that he did not call an OB/GYN because he determined that it was not necessary to present additional defense experts beyond Dr. Jones. (PCRA Hr'g Tr. at 138-39, 159). After all, Dr. Jones was a forensic pathologist who also had experience as an obstetrician. Lucas explained: "I was never in a position where I felt that he wouldn't carry the day, so to speak, or be disqualified or be disbelieved by a jury solely because he did not have the requisite experience in OB/GYN because he did have the requisite experience in at least obstetrics." (Id. at 159). He also stated that:

> [I]n my experience at least, calling multiple experts for the defense to testify to similar facts invariable leads to inconsistencies in the defense theory of the case.... *So if I have a case that lends itself to a single expert that has relied on other reports and has done the work that the expert was paid to do and their opinion is solid and on point, then I wouldn't have hired another expert even if there had been funds available. But this was not a case that was done on a completely unlimited budget. I mean, hiring one expert is expensive enough, let along two or three. And there was a difficult time enough getting Doctor Jones paid.*

(Id. at 137 (emphasis added)).

In addressing Petitioner's specific contention that he should have called Dr. Harms as an expert witness, Lucas noted that he had reviewed Dr. Harms' letter, but was not swayed from his determination that the defense would be served best by presenting expert testimony solely through Dr. Jones. Lucas further explained that calling only Dr. Jones would avoid the potential of presenting conflicting expert testimony, and it also took into consideration the fact that the defense did not have unlimited funds in hiring expert witnesses. (Id. at 145). Lucas stated that:

> Doctor Jones based his opinion that he testified to at the jury trial in part by Doctor Harms' review and report to Doctor Jones. That was absolutely legitimate.... Doctor Harms was consulted by Doctor Jones in a effort to plug a hole, if you will, I guess, or provide extra information or impetus to the opinion that Doctor Jones was going to render to the jury. And that was the reason for Doctor Harms involvement, and that was the reason for the letter that Doctor Harms wrote to Doctor Jones.

(Id. at 144). Thus, since Dr. Jones had consulted with Dr. Harms and had based his expert report and testimony based in part on that consultation, Lucas did not believe it was necessary to call

12

Dr. Harms.  (Id. at 144-45, 169).

In determining that Lucas provided constitutionally sufficient representation and that Petitioner was not prejudiced, the PCRA Court held:

> Petitioner asserts trial counsel was ineffective for failing to call medical experts in the fields of obstetrics and gynecology to counter Dr. Andrea T. Jeffress' testimony.... Dr. Miles Jones testified as a medical expert on Petitioner's behalf at trial that the fetus died of an infection prior to the assault on Ms. Carson. According to Dr. Jones' testimony, he spent two years in the department of gynecologic and obstetric pathology at the U.S. Armed Forces Institute of Pathology.  Therefore, Dr. Jones had some medical experience reasonably sufficient to refute Dr. Jeffress' testimony.  During the evidentiary hearing, Attorney Lucas testified his trial strategy was to keep the number of expert witnesses to a minimum in order to avoid exploitation of possible inconsistencies in their testimony by the Commonwealth.  Therefore, Attorney Lucas reasonably believed Dr. Jones possessed sufficient expertise to counter the Commonwealth's expert testimony at trial, and was not ineffective for failing to call additional expert witnesses.
>
> ---
>
> Regarding trial counsel's failure to call Dr. Roger W. Harms as a witness, Attorney Lucas testified that Petitioner's medical expert witness, Dr. Jones, contacted Dr. Harms and consulted with him to review Ms. Carson's sonograms. Dr. Jones then based his expert opinion, in part, on his consultation with Dr. Harms.  As noted above, Attorney Lucas' trial strategy was to utilize as few experts as possible in order to avoid exploitation of possible inconsistencies in their testimony by the Commonwealth.  Further, Petitioner was not prejudiced by the absence of Dr. Harms' testimony because it formed the predicate basis for Dr. Jones' expert testimony at trial.

(Id. at 9-10).

The PCRA Court's adjudication withstands AEDPA's deferential standard of review. Lucas articulated objectively reasonable bases for making the decisions that he did, and his decisions are precisely the type that should not be second guessed by a federal habeas court. Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); see also Thomas, 428 F.3d at 500 ("where it is shown that a particular decisions was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively unreasonable becomes 'virtually unchallengeable.'").

Petitioner argues that Lucas' decisions were not reasonable because he did not conduct the necessary investigation before making them.  Her argument is not persuasive.  Lucas obtained Carson's medical records and sonograms, the autopsy report, and the results of the post-mortem

13

testing of the fetus and placenta, and provided that information to Dr. Jones.  Dr. Jones is a board certified forensic pathologist *who also served for two years in the department of gynecology and obstetrics in the AFIP*.  (Day Five Trial Tr. at 40-42).  He testified at trial that during those two years he "did nothing but look at gynecologic breasts *and obstetrical specimens*.  The AFIP on average sees over a thousand cases in the department each year.  When I was there, those cases were divided among five pathologists.  *So I had extensive experience in that from cases worldwide*."  (Id. at 42 (emphasis added)).  Lucas' pre-trial consultation with Dr. Jones, during which Dr. Harms' letter was reviewed, in and of itself constituted a constitutionally adequate investigation.  Moreover, in addition to securing the services of Dr. Jones, Lucas met with Carson's OB/GYN, Tai Bu, M.D., and spent "hours and hours over the course of two weeks prior to trial" with Dr. James Esper, who was associated with Petitioner's mother and who also had examined the relevant medical records.  (Id. at 133-34, 140-46)).

Petitioner's claim of ineffective assistance also fails because she has not established that she was prejudiced by Lucas' decision not to present the testimony of an OB/GYN.  The circumstantial evidence against her was strong.  Carson was impregnated with Petitioner's husband's baby and every indication was that the pregnancy was proceeding without problems until Petitioner kicked her while saying that she "hoped the bastard dies."  Within hours of the fight, an emergency room doctor was unable to find a fetal heartbeat.  Petitioner has not shown that there is a reasonable probability that the jury would have reached different verdicts had Dr. Harms testified consistent with the statements he made in his March 17, 2003, letter (which is the only evidence this Court may consider as to what testimony an OB/GYN could have offered, as that is the only evidence Petitioner presented to the PCRA Court).

In addition, in explaining in his letter to Dr. Jones how he arrived at his "best estimate" of the gestational age of Carson's fetus at the time of death, Dr. Harms started with the presumption that on June 12, 2002, Carson should have been at 19 weeks gestation if one was measuring "*by [Carson's] last menstrual period*[.]"  (3/17/2003 Letter, attached to SCR No. 52 (emphasis added)).  He then stated that based on the data from the June 12, 2002, sonogram, his "best estimate" was that "demise would have occurred likely in the 17 to 18-week time frame."  (Id.)

Thus, Dr. Harms estimated that the fetus was 17 to 18-weeks in gestational age at the time of death based on the data provided by the June 12, 2002, sonogram, which is consistent with Dr. Jeffress' and Dr. Vey's trial testimony. (Day Four Trial Tr. at 45, 172-76).

Finally, Dr. Jeffress testified that the gestational age estimation made from a second trimester sonogram can be off anywhere from 7 to 10 days. Therefore, Dr. Harms' "best estimation" of gestational age would not have had as significant an impact as Petitioner contends. Because of the range of dates that a gestational age estimation encompasses, there was no prejudice from Lucas' decision not to call Dr. Harms. Additionally, it was objectively reasonable for Lucas to have focused on the cause of death, which is something upon which Dr. Harms offered no opinion, and not argue about the date of death, which could not be established with sufficient relevant precision.

In the end, Petitioner cannot overcome the law's strong presumption that Lucas' decision to present only the testimony of Dr. Jones fell outside the wide range of reasonable professional assistance required by the Sixth Amendment, or that his decision resulted in prejudice. Most importantly, she has not shown that the PCRA Court's adjudication denying her ineffective assistance claim was contrary to or an unreasonable application of Strickland or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). Therefore, the Amended Petition For a Writ Of Habeas Corpus is denied.

### C. Certificate of Appealability

28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]" Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Applying this standard here, jurists of reason would not find it debatable whether the claim raised in the

Amended Petition For a Writ Of Habeas Corpus is without merit. Accordingly, a certificate of appealability should be denied.

### III.    CONCLUSION

For the foregoing reasons, the Amended Petition For a Writ Of Habeas Corpus is denied, a certificate of appealability is denied, and Petitioner's motion for an evidentiary hearing is denied. An appropriate Order follows.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: February 15, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CORINNE D. WILCOT**<br>　　　　Petitioner,<br><br>　　　　v.<br><br>**SUPERINTENDENT WILSON, et al.,**<br>　　　　Respondents. | ) <br>) Civil Action No. 07-299 Erie<br>)<br>) **Magistrate Judge Baxter**<br>)<br>)<br>) |

## ORDER

AND NOW, this 15th day of February, 2010;

IT IS HEREBY ORDERED that the Amended Petition For a Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 [Document No. 25] is denied and a certificate of appealability is denied. The Clerk of Courts is directed to close this case.

IT IS FURTHER ORDERED that Petitioner's motion of an evidentiary hearing [Document No. 28] is denied.

　　　　　　　　　　　　　　　　　　　　　　/s/ Susan Paradise Baxter
　　　　　　　　　　　　　　　　　　　　　　SUSAN PARADISE BAXTER
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge